NOTICE
Decision filed 07/30/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240605-U

NO. 5-24-0605

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 22-CF-132 |
| | ) | |
| JEREMY RAMEY, | ) | Honorable |
| | ) | Derek J. Girton, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice Cates and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*: The evidence was sufficient to support defendant's conviction for unlawful possession of a weapon by a felon. Defense counsel was not ineffective for stipulating to the admission of DNA evidence. Defendant's challenge that section 24-1.1(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.1(a)) is facially unconstitutional and unconstitutional as applied to him is without merit.

¶ 2     Following a Vermilion County jury trial, defendant, Jeremy Ramey, was convicted of unlawful possession of weapon by a felon. On direct appeal, defendant claims (1) the State failed to prove him guilty beyond a reasonable doubt, (2) his attorney was ineffective for stipulating to DNA evidence, and (3) section 24-1.1(a) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/24-1.1(a) (West 2022)) is facially unconstitutional and unconstitutional as applied. For the following reasons, we affirm the judgment of the trial court.

1

¶ 3                                    I. BACKGROUND

¶ 4    On March 21, 2022, an officer with the Danville Police Department, Henry Schroeder, responded to a call of "shots fired" when he saw defendant standing near a street corner. Believing that defendant shot a firearm in the direction of passing cars, Schroeder activated his emergency lights, and defendant fled on foot. Following a short pursuit, defendant was taken into custody. Schroeder found a firearm located at the base of a tree where he saw defendant place an object.

¶ 5    Defendant was charged with (1) count I, aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)); (2) count II, possession of a stolen firearm (*id.* § 24-3.8(a)); (3) count III, unlawful possession of a weapon by a felon (UPWF) (*id.* § 24-1.1(a)); and (4) count IV, resisting or obstructing a peace officer (*id.* § 31-1(a)). Prior to trial, the State dismissed counts II and IV.

¶ 6    The matter proceeded to a jury trial on January 17, 2024. The following evidence was presented at trial. Schroeder testified that on March 21, 2022, he was a patrol officer with the Danville Police Department. He was in the vicinity of a "shots fired" call and responded to the area when he heard shots being fired. He saw two vehicles drive through the intersection in front of him and notified dispatch that he had two vehicles shooting at each other. Schroeder testified that he then saw a person, later identified as defendant, standing down the street, firing at those vehicles. Schroeder activated his emergency lights, and defendant fled on foot. Schroeder pursued defendant. Schroeder testified that, while being pursued, defendant tripped and fell, got back up, and continued running. Schroeder told the jury that defendant "then continues to go behind a tree, or partially behind a tree." According to Schroeder, when defendant reached the tree, "he goes down, gets back up and then" followed Schroeder's commands to show his hands.

¶ 7    Schroeder's squad car video was played for the jury. It showed that while running, defendant tripped and fell near a tree. It also showed that defendant then stood up and started

2

running again, this time headed toward a tree with three trunks. Defendant also ran in the direction of a white Dodge Durango that was parked nearby.

¶ 8 Schroeder stopped and exited his squad car. He drew his firearm and instructed defendant to show his hands. Defendant complied. Officer John Casey, also of the Danville Police Department, arrived on the scene and helped Schroeder take defendant into custody. Although defendant initially refused to provide his name, eventually he did so.

¶ 9 According to testimony, the squad car video and Casey's body cam video, which was also admitted into evidence and played for the jury, Schroeder and Casey noticed the Durango had bullet holes in it. With defendant secured in the back of a squad car, the two officers checked the Durango to see whether there were any victims or anyone in need of medical attention. Finding none, the two officers returned to their squad cars and checked the three-trunked tree where defendant fell.

¶ 10 The officers recovered a loaded 9-millimeter semiautomatic handgun at the base of the tree. When fully loaded, the handgun was capable of holding 18 rounds of ammunition. When the officers recovered the gun, it was loaded with 16 rounds. The handgun was secured into evidence. Defendant denied any knowledge of a gun, telling the officers that the people in the vehicles were shooting at him. A subsequent search of defendant revealed that he had a key fob to the Durango. Defendant was eventually taken to the police department where another officer administered a gunshot residue (GSR) test.

¶ 11 On cross-examination, Schroeder acknowledged that he told dispatch that, "I've got two vehicles shooting at each other." Schroeder explained, "That is initially what I thought ***." Schroeder also acknowledged that he told dispatch that he had a subject running but never told dispatch that he saw the subject shooting.

3

¶ 12    The State also presented evidence that, after securing defendant, a canine unit was called in to assist with locating evidence. Schroeder joined the canine officer in canvassing the area, where the shooting was reported to have occurred. Other officers participated as well. The police collected a total of 18 spent 9-millimeter cartridge casings. Twelve of the casings were found at various locations on the street and six were collected from the passenger compartment of the Durango. Subsequent testing of the casings revealed that 12 of the casings were fired from a gun other than the one recovered. The testing of the six casings seized from the Durango was inconclusive when compared to the recovered firearm, meaning that the recovered firearm could not be either identified or excluded as having fired those cartridges. Although the results of the testing were inconclusive, the jury viewed photographs demonstrating similarities between some of the casings recovered from the Durango and a casing that had been fired out of the recovered firearm by a forensic scientist with the Illinois State Police.

¶ 13    A GSR expert testified for the State. He testified that there can be three results from a GSR test: (1) a positive test, (2) a negative test, or (3) an inconclusive test. The expert stated that although defendant's left hand tested positive for the presence of GSR, the test results from defendant's right hand were inconclusive. A positive test means that the subject either discharged a firearm, was in close proximity to a firearm that was discharged, or came in contact with a GSR-related item. The expert further explained that an inconclusive test means that the subject may have discharged a firearm, may have been in close proximity to a firearm that was discharged, may have had contact with a GSR-related item, or may have come in contact with the tested elements from an environmental source. The State's GSR expert also testified that, because defendant's left hand tested positive for GSR, he did not test the gloves defendant was wearing at the time of his arrest.

4

¶ 14   The parties stipulated that the State's DNA witness was an expert in DNA/STR[1] mix identification analysis and that she conducted DNA analysis of swabs taken from the recovered firearm and from defendant. Regarding the swab taken from the handle of the firearm, the stipulation read:

> "a.    The DNA profile is approximately 34,000 times more likely if it originated from [defendant] and three unknown individuals, than if it originated from four unknown individuals; and
>
> b.    This analysis provides strong support for the proposition that [defendant] is a contributor to the DNA Profile[.]"

With regard to the UPWF charge, the parties also stipulated that defendant was previously convicted of a qualifying felony offense.

¶ 15   The State rested and the defense did not present any evidence. Following closing arguments and jury instructions, the jury convicted defendant of UPWF and acquitted him of aggravated discharge of a firearm. No posttrial motions were filed.

¶ 16   The matter proceeded to sentencing on April 1, 2024. At sentencing, the parties agreed to a sentence that resolved another, unrelated case. In the instant matter, defendant was sentenced to two years in the Illinois Department of Corrections. Defendant timely filed a notice of appeal.

¶ 17                               II. ANALYSIS

¶ 18   As noted above, defendant raises three issues on appeal. First, he contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Second, he argues that defense counsel provided ineffective assistance by stipulating to the DNA evidence. Finally, defendant maintains that section 24-1.1(a) of the Code (720 ILCS 5/24-1.1(a) (West 2022)) is facially

---

[1]"DNA/STR" is an abbreviation for deoxyribonucleic acid/short tandem repeats.

5

unconstitutional and unconstitutional as applied. For the reasons that follow, we affirm defendant's conviction.

¶ 19                                 A. Sufficiency of the Evidence

¶ 20    First, defendant contends that the evidence was insufficient to sustain his conviction. In support of his argument, defendant specifically argues that the GSR test and the DNA test were inconclusive, there was conflicting testimony regarding the timing of when the firearm was recovered, the firearm was not found on defendant's person, there was no direct evidence linking defendant to the firearm that was recovered or the firearm to the fired shell casings, and that defendant repeatedly told officers that it was not his gun. The State argues that the cumulative weight of the evidence was sufficient for a rational trier of fact to find defendant guilty beyond a reasonable doubt. We agree with the State.

¶ 21    The standard employed when faced with a challenge to the sufficiency of the evidence is well established. When considering such a challenge, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The standard of reasonable doubt "does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Campbell*, 146 Ill. 2d 363, 374 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), quoting *Woodby v. Immigration & Naturalization Service*, 385 U.S. 276, 282 (1966)). Rather, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Bush*,

2023 IL 128747, ¶ 33 (quoting *Collins*, 106 Ill. 2d at 261). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)).

¶ 22    This standard of review "is applicable in all criminal cases, regardless of whether the evidence is direct or circumstantial." *Campbell*, 146 Ill. 2d at 374 (citing *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). Circumstantial evidence is sufficient to support "a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Id.* at 379. This "standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* at 375 (quoting *Jackson*, 443 U.S. at 319). For this reason, a reviewing court "will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 51 (1989)). We "will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* (citing *Collins*, 106 Ill. 2d at 261).

¶ 23    In order to sustain a conviction for UPWF, the State must prove that defendant (1) knowingly possessed a firearm and (2) had previously been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2022). Given that the defendant stipulated to having been previously convicted of a felony offense, the defendant does not challenge the sufficiency of the evidence to prove the second element. Therefore, we restrict our analysis to whether the defendant knowingly possessed a firearm.

7

¶ 24 The thrust of defendant's argument regarding the sufficiency of the evidence is that none of the evidence is conclusive as to defendant's guilt. For example, defendant points to inconsistencies in Schroeder's testimony, and maintains that, by acquitting defendant of the aggravated discharge of a firearm, the jury "discount[ed] significant portions of Schroeder's account" of the events that night. Defendant points to discrepancies between Schroeder's testimony and the videos shown to the jury regarding when Schroeder reported the presence of the firearm to dispatch. Regarding the videos, defendant notes that the videos do not support Schroeder's claim that he saw defendant place something on the ground.

¶ 25 Defendant also contends, notwithstanding the fact that defendant's left hand tested positive for GSR, that the GSR evidence in this matter was "not conclusive" since the test for defendant's right hand was "inconclusive." Defendant also asserts that the DNA/STR analysis evidence is of little value because the evidence, as stipulated, was "represented in the particularly unreliable form of a likelihood ratio upon which it was inaccurate to draw the conclusion that [defendant's] DNA was present" on the recovered weapon. According to defendant, "[t]he State's evidence appears to rely not on the strength of any particular piece of evidence, but on the sheer number of weak and circumstantial elements it has presented." We disagree.

¶ 26 Defendant's arguments are an invitation for this court to reweigh the evidence, but that is not this court's role. *Campbell*, 146 Ill. 2d at 375. Regarding Schroeder, specifically, the jury heard his testimony and was able to observe his demeanor. Moreover, Schroeder was thoroughly cross-examined by defense counsel. During closing argument, defense counsel pointed to inconsistencies between Schroeder's testimony and the videos, and argued that Schroeder was not credible. Whether minor inconsistencies in testimony irreparably undermined the credibility of the State's

witnesses is a matter for the trier of fact to decide. *People v. Howard*, 376 Ill. App. 3d 322, 329 (2007).

¶ 27   Regarding the placement of the recovered firearm, the squad car video shows that defendant fell near a tree with a single trunk before he continued to flee in the direction of a tree with three trunks. Defendant's placement of the firearm near this second tree is not shown on the squad car video due to the angle of the squad car in relation to the tree. However, the recovery of the firearm is shown on the bodycam video from Officer Casey. Schroeder's testimony was not inconsistent with the videos shown to the jury.

¶ 28   With regard to the time discrepancy between when Schroeder discovered the gun and the time that he reported it to dispatch, Schroeder explained that the scene was secure, so he and Casey decided to check for victims in the bullet-damaged Durango. Defendant's statement that Schoeder's actions are implausible does not make it so. The jury heard the testimony of the officers, and examined the evidence, and there is nothing inherently implausible about Schroeder's testimony, especially when viewed in the light most favorable to the State. Indeed, we find that Schroeder's testimony, coupled with the video evidence, to be overwhelming evidence of defendant's guilt.

¶ 29   Contrary to defendant's argument, we also find that the GSR evidence provided further support for the conclusion that the evidence in this matter was sufficient enough to convict. While the GSR test from defendant's right hand was inconclusive, the test of defendant's left hand was positive, meaning that defendant had either discharged a firearm, was in close proximity to a firearm that was discharged, or came in contact with a GSR-related item. With regard to the DNA evidence, defendant argues, on appeal, that this evidence was presented as two competing hypotheticals that allowed "the jury to infer guilt based upon statistical modeling" as opposed to

9

the conclusive identification of defendant's DNA, and this does not establish that defendant handled the firearm. We note that defendant does not challenge the admissibility of this evidence. Notwithstanding the fact that the DNA/STR evidence does not conclusively prove that defendant possessed the firearm, we find that the evidence is still probative, relevant, and supports the jury's finding of guilt.

¶ 30    In summary, the State presented evidence that a police officer believed that he saw defendant fire a gun. When the officer activated his emergency lights, defendant fled. While pursuing defendant, the officer saw defendant place an item at the base of a tree. After defendant was taken into custody, a firearm was recovered at the base of the tree. A search of defendant's person led to the discovery of a key fob to a nearby, bullet-ridden vehicle. Fired casings were recovered from inside that vehicle, and although forensics could not definitively match those casings to the recovered firearm, the firearm could not be eliminated as being the gun that fired those casings. Indeed, the jury was shown photographs demonstrating similarities between the casings recovered from the Durango and a casing known to have been fired from the recovered firearm. GSR testing demonstrated that defendant discharged a firearm, was in close proximity to a firearm that was discharged, or came in contact with a GSR-related item.

¶ 31    In summary, defendant's argument that the evidence was insufficient to prove his guilt is based upon various pieces of evidence which defendant views in isolation. This request, however, goes against our standard of review. This court must not reweigh the evidence. *Campbell*, 146 Ill. 2d at 375. Rather, we must view the evidence as a whole in the light most favorable to the State. *Bush*, 2023 IL 128747, ¶ 33. When viewed in the light most favorable to the State, the evidence of defendant's guilt is overwhelming.

¶ 32                     B. Ineffective Assistance of Counsel

¶ 33    Defendant's next argument is that trial counsel provided ineffective assistance of counsel by stipulating to the "confusing and inaccurate DNA evidence linking Jeremy to the recovered weapon." According to defendant, the stipulated evidence "relied on assumptions and inferences that lacked a firm evidentiary support" and "served to obscure the limitations of this kind of evidence." Defendant argues that by stipulating to the DNA evidence, defense counsel's performance fell below an objective standard of reasonableness, and that defendant was prejudiced as a result. The State responds that stipulating to the evidence "was a reasonable strategic choice that fell well within the range of professionally competent assistance" and that defendant suffered no prejudice in light of the overwhelming evidence of defendant's guilt. We agree with the State.

¶ 34    Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and （２） a reasonable probability exists that, but for the error, the result would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). A reviewing court does not need to determine whether counsel's performance was deficient before considering the prejudice prong of the *Strickland* test: " 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will

11

often be so, that course should be followed.' " *Albanese*, 104 Ill. 2d at 527 (quoting *Strickland*, 466 U.S. at 697).

¶ 35    To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411. If defendant's claim can be disposed of on the basis that he suffered no prejudice, then a court should not decide whether counsel's performance was deficient. *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

¶ 36    We find that defendant cannot demonstrate a reasonable probability exists that the result would have been different had defense counsel not stipulated to the DNA evidence. Defendant does not contend that an effective cross-examination of the State's DNA expert would have changed the expert's conclusions, but instead would have tested the strength of the evidence and exposed the limitations of the evidence, demonstrating that the expert's conclusions were not infallible. Even assuming, *arguendo*, this is accurate, defendant's only argument that he was prejudiced by the stipulation is that the evidence in this matter was "weak." As noted above, however, we find that the evidence is overwhelming, even in the absence of the DNA evidence. Since defendant cannot satisfy the prejudice prong of *Strickland*, his argument that defense counsel was ineffective is without merit.

¶ 37                    C. Constitutionality of Section 24-1.1(a)

¶ 38    Defendant next argues, for the first time on appeal, that the UPWF statute violates his second amendment right under the United States Constitution, both facially and as applied to him. Generally, issues raised for the first time on appeal are forfeited. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 56-57; *People v. McCarty*, 223 Ill. 2d 109, 122 (2006). However, a facial challenge to the constitutionality of a statute may be raised at any time, including for the first time

12

on appeal. *People v. Baker*, 2023 IL App (1st) 220328, ¶ 35. In addition, an as-applied challenge may be raised for the first time on appeal, as long as the record is sufficiently developed to permit the reviewing court to fully analyze the claim. *Brooks*, 2023 IL App (1st) 200435, ¶ 57.

¶ 39     The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. "The United States Supreme Court has 'recognized that the Second and Fourteenth Amendments [(U.S. Const., amends. II, XIV)] protect the right of an ordinary, law-abiding citizen to possess and handgun' inside and outside the home 'for self-defense.' " *People v. Burns*, 2024 IL App (4th) 230428, ¶ 14 (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8-9 (2022), and citing *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010)).

¶ 40     As noted above, defendant challenges the validity of section 24-1.1(a) of the Criminal Code, which provides, provides, in relevant part, as follows:

> "(a) It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2022).

¶ 41     All statutes carry a strong presumption of constitutionality, and the party challenging the constitutionality of a statute carries the burden of proving the statute is unconstitutional. *People v. Mosley*, 2015 IL 115872, ¶ 22. This court has a duty to construe the challenged statute in a manner that upholds its validity and constitutionality whenever reasonably possible. *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 12. A statute's constitutionality is a question of law that we review *de novo*. *People v. Smith*, 2025 IL App (5th) 230656, ¶ 12.

¶ 42 "A constitutional challenge to a statute may be either facial or as applied." *Burns*, 2024 IL App (4th) 230428, ¶ 11. In order to succeed on a claim that a statute is facially unconstitutional, the defendant must show that the statute is unconstitutional under any set of facts. *Kelley*, 2024 IL App (1st) 230569, ¶ 12. A defendant's particular circumstances are irrelevant. *Baker*, 2023 IL App (1st) 220328, ¶ 34. In contrast, an as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. *Brooks*, 2023 IL App (1st) 200435, ¶ 57.

¶ 43 We first consider defendant's facial challenge. Defendant contends that under the United States Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680 (2024), the text of the second amendment "covers the conduct of possessing a firearm regardless of whether someone is 'law-biding.' " We note that the *Rahimi* Court "did not address whether felons could be prohibited from possessing firearms based on their status as felons." *People v. Huff*, 2025 IL App (4th) 240762, ¶ 17. Instead, the *Rahimi* Court addressed only the issue of whether the defendant "could be temporarily prohibited from possessing firearms based on a domestic violence restraining order, which found he posed 'a credible threat to the physical safety of [an] intimate partner.' (Internal quotation marks omitted.)" *Id.* (citing *Rahimi*, 602 U.S. at 684-86). As noted by the *Huff* court, "the only mention of felons in the [*Rahimi*] majority's opinion is when the Court reiterated its prior statement from [*Heller*] regarding the presumptive lawfulness of prohibitions against felons possessing firearms." *Id.* (citing *Rahimi*, 602 U.S. at 682). For these reasons, we find defendant's reliance on *Rahimi* is misplaced.

¶ 44 In *Bruen*, the United States Supreme Court announced a two-part analysis for review of laws affecting the right to bear arms, and the standard for applying the second amendment is as follows:

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 24.

Illinois courts have concluded that "the two-part process requires us to determine (1) whether defendant's conduct falls within the plain text of the second amendment and, if so, (2) whether there is a justification for the regulation rooted in history and tradition." *People v. Travis*, 2024 IL App (3d) 230113, ¶ 24.

¶ 45    We considered the *Bruen* analysis in *People v. Smith*, 2025 IL App (5th) 230656, ¶ 25, which agreed with the reasoning in federal and appellate court decisions which concluded that "felons are not protected under the plain text of the second amendment." *Smith* found that "a defendant who is in the process of committing a felony while possessing an operational firearm does not fall into the category of 'the people' protected by the second amendment." *Id*. Furthermore, numerous other Illinois decisions have addressed whether felons are protected by the second amendment. See *People v. Spears*, 2026 IL App (5th) 240625, ¶ 64; *People v. Lomax*, 2026 IL App (5th) 240889-U, ¶ 43; *People v. Arrington*, 2025 IL App (5th) 230344-U, ¶ 43; *People v. Honorable*, 2025 IL App (5th) 220743-U, ¶ 30; *People v. Hudson*, 2025 IL App (5th) 231140-U, ¶ 19; *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 22; *People v. McTizic*, 2025 IL App (1st) 240467-U, ¶¶ 8-13; *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 20; *People v. Whitehead*, 2024 IL App (1st) 231008-U, ¶¶ 85, 89; *People v. Thomas*, 2024 IL App (4th) 240315-U, ¶¶ 23-24; and *Kelley*, 2024 IL App (1st) 230569, ¶¶ 16-22.

¶ 46    The Fifth District case, *People v. Stephens*, 2024 IL App (5th) 220828, followed the reasoning in a federal court decision in *United States v. Ware*, 673 F. Supp. 3d 947, 956 (S.D. Ill. 2023), and concluded that the defendant fell "into the category of 'the people' protected by the

15

second amendment," regardless of his status as a felon. *Stephens*, 2024 IL App (5th) 220828, ¶ 33. *Stephens* nevertheless found section 24-1.1(a) to be facially constitutional under the second amendment where "the State has met its burden of showing that section 24-1.1(a) is consistent with this nation's historical tradition of firearm regulation." *Id.* ¶ 39. We respectfully disagree with *Stephens*'s approach and follow the reasoning addressed in the *Smith* decision. See *id.* ¶ 33; *Smith*, 2025 IL App (5th) 230656, ¶ 25.

¶ 47 As such, we find that because of the defendant's criminal history, he is not included as part of "the people" protected under the second amendment. Because defendant cannot claim the protection of the second amendment, defendant's facial challenge to the UPWF statute fails under the first part of *Bruen*'s test. We need not address the second step of the analysis in *Bruen*.

¶ 48 We next consider defendant's argument that section 24-1.1(a) is unconstitutional as applied to him. As noted above, an as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. *Brooks*, 2023 IL App (1st) 200435, ¶ 57. Defendant argues that the statute is unconstitutional as applied to him, because his prior felony conviction is for a nonviolent offense. Although defendant did not raise an as-applied challenge in the trial court, we find the record is sufficient enough that this court can review his claim. The State seemingly concedes this point, as it does not argue that the record is insufficient. Thus, we will consider the defendant's claim.

¶ 49 In *Baker*, 2023 IL App (1st) 220328, our colleagues in the First District considered the same statute at issue in this case. There, the court considered the defendant's as-applied constitutional challenge to the unlawful use of a weapon by a felon statute, the same statute at issue in this case. *Id.* In that case, the court found that *Bruen* did not apply to a defendant who had been previously convicted of a felony because the *Bruen* Court could not have been "more clear that its

16

newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant." *Id.* ¶ 37. Thus, the court found that defendant was "outside the box drawn by *Bruen*" (*id.*), and that the statute was not unconstitutional as applied to him. *Id.* ¶ 41.

¶ 50    Moreover, challenges seeking to create a distinction between being a violent felon and a nonviolent felon for the purposes of *Bruen* and the second amendment have been rejected. See *Lopez*, 2025 IL App (1st) 232120, ¶ 26. For example, in *Travis*, 2024 IL App (3d) 230113, ¶ 37, the court found that the armed habitual criminal and unlawful use of a weapon by a felon statutes were constitutional as applied to defendant, irrespective of the violent or nonviolent nature of his convictions. Also, in *Brooks*, 2023 IL App (1st) 200435, ¶ 100, the armed habitual criminal statute was upheld as constitutional, as applied to a defendant with prior nonviolent felonies, because the defendant was "not a law-abiding citizen."

¶ 51    Thus, we likewise find that the UPWF statute is constitutional, as applied to the defendant, irrespective of the violent or nonviolent nature of his convictions as well as the age of those prior felony convictions. Accordingly, we find that the defendant's challenges fail both facially and as applied to him.

¶ 52                                         III. CONCLUSION

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Vermilion County.


¶ 54    Affirmed.

17